IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

GEORGIA TEACHER,                    )
                                    )
          Plaintiff,                )
                                    )
v.                                  )     CIVIL ACTION NO. 14-0179-MU
                                    )
NANCY A. BERRYHILL,                 )
Acting Commissioner of Social Security, )
                                    )
          Defendant.                )


## MEMORANDUM OPINION AND ORDER

Plaintiff Georgia Teacher brings this action, pursuant to 42 U.S.C. §§

405(g) and 1383(c)(3), seeking judicial review of a final decision of the

Commissioner of Social Security ("the Commissioner") denying her claim for

Supplemental Security Income ("SSI"), based on disability. The parties have

consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28

U.S.C. § 636(c), for all proceedings in this Court. (Doc. 35 ("In accordance with

the provisions of 28 U.S.C. 636(c) and Fed.R.Civ.P. 73, the parties in this case

consent to have a United States Magistrate Judge conduct any and all

proceedings in this case, . . . order the entry of a final judgment, and conduct all

post-judgment proceedings.")). Upon consideration of the administrative record,

Teacher's brief, the Commissioner's brief, and all other documents of record, it is

determined that the Commissioner's decision denying benefits should be affirmed.[1]

<h1 style="text-align:center">I.  PROCEDURAL HISTORY</h1>

Teacher applied for SSI, based on disability, under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 1381-1383d, on February 1, 2011. (Tr. 267). Her application was denied on November 2, 2012. After exhausting her administrative remedies (Tr. 67), Teacher sought judicial review in this Court, pursuant to 42 U.S.C. §§ 405(g) and 1383(c). (Doc. 1). Because the Commissioner was unable to produce a transcript of Plaintiff's administrative hearing, this Court remanded the case for further administrative proceedings, pursuant to "sentence six" of 42 U.S.C. § 405(g). (Docs. 11, 12). On remand, a new hearing was held before an Administrative Law Judge ("ALJ") (Tr. 1-33), and by a decision dated June 20, 2015, the ALJ concluded that Teacher was not disabled within the meaning of the Act. (Tr. 631-47). The ALJ's decision constitutes the Commissioner's final decision for the purposes of judicial review. *See* 20 C.F.R. § 416.1484(a).

On February 26, 2016, the Court entered an order granting the parties' consent motion to reopen the case. (Doc. 15). The Commissioner filed an answer and the social security transcript on May 25, 2016, and filed a supplemental social security transcript on August 4, 2016. (Docs. 18, 19, 24). On September 6,

---

[1] Any appeal taken from this Order and Judgment shall be made to the Eleventh Circuit Court of Appeals. *See* Doc. 35 ("An appeal from a judgment entered by a Magistrate Judge shall be taken directly to the United States Court of Appeals for the judicial circuit in the same manner as an appeal from any other judgment of this district court.").

2016, Teacher filed a brief in support of her claim. (Doc. 28). The Commissioner filed her brief on November 21, 2016. (Doc. 31). The parties waived oral argument. (Docs. 34, 36). The case is now ripe for decision.

## II.  CLAIMS ON APPEAL

Teacher alleges that the ALJ's decision to deny her benefits is in error for the following three reasons:

1. The ALJ's finding that Teacher's headache disorder is a non-severe impairment is not supported by substantial evidence;

2. The ALJ failed to rebut the presumption regarding Teacher's mental incapacity; and

3. The ALJ's mental residual functional capacity assessment is not supported by the record as a whole, as he erred in his evaluation of the opinion of an examining physician.

(Doc. 28 at p. 2).

## III. ALJ'S DECISION

Plaintiff has alleged disability due to cystic fibrosis, chronic asthma, lung disease, bipolar disorder, and depression. (Doc. 28 at p. 1).  Before the ALJ, Teacher testified that she is also disabled due to a headache problem. (Tr. 10). The ALJ made the following relevant findings in his July 20, 2015 decision:

> **1.  The claimant has not engaged in substantial gainful activity since February 1, 2011, the application date (20 CFR 416.971 *et seq.*).**
>
> **2.  The claimant has the following severe impairments: borderline intellectual functioning; asthma; and a mood disorder, NOS (provisional) (20 CFR 416.920(c)).**

Accordingly, the undersigned notes that a qualified physician has either diagnosed or significantly documented the limiting effects of the above-referenced impairments within the medical evidence of record. Further, the undersigned finds that the above impairments cause significant limitation in the claimant's ability to perform basic work activities. Thus, the claimant has impairments that are considered severe pursuant to the regulations.

The claimant also has a number of non-severe impairments that have been considered in concert with the severe impairments to determine the claimant's residual functional capacity. The claimant has history of alcohol abuse and a headache disorder. At the previous hearing and decision, there was an indication the claimant had cystic fibrosis, but at this hearing Dr. Whatley, the medical expert, testified he had reviewed the record and that it did not establish by objective means that the claimant had cystic fibrosis, so he did not assess it as an impairment. The indications of COPD are here considered under Asthma, and the previous indications of a major depressive disorder and an adjustment disorder are here considered under the impairment of a mood disorder, NOS, provisional, upon further consideration of the medical record.

* * *

In regards to her headache disorder, the evidence documents several complaints of a headache; however, there is no actual treatment for the disorder. In fact, most of her complaints of a headache have resulted in a diagnosis of a sinus infection. Her examinations have been unremarkable and there is no evidence indicating she is on any pain narcotics or any radiological and/or laboratory findings noting the severity of the disorder. Therefore, the undersigned finds the impairment has not significantly limited or is likely to significantly limit the claimant's ability to do basic work activities and is therefore non-severe.

**3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).**

The claimant's asthma does not meet or medically equal the criteria of listing 3.03 because the evidence does not indicate any chronic asthmatic bronchitis or attacks in spite of prescribed treatment and requiring physician intervention, occurring at least once every two months or at least six times a year.

The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.02 and 12.04. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

In activities of daily living, the claimant has mild restriction. In a Function Report - Adult, the claimant reported she can attend to her personal needs independently. She reported she can prepare her own meals, shops in stores for groceries, and clean her room sometimes. (Exhibit C5E). This supports the claimant has no more than mild limitations in this area.

In social functioning, the claimant has moderate difficulties. In the aforementioned report, the claimant reported she has a problem getting along with family, friends, neighbors, and others; however, she reported she spends time with others. She also reported she enjoys reading and watching television and she goes to her kid's school and the grocery store on a regular basis (Exhibit C5E). This supports the claimant has no more than moderate limitations in this area.

With regard to concentration, persistence or pace, the claimant has moderate difficulties. In the aforementioned report, the claimant reported she has problems completing tasks, memorizing, concentrating, understanding, following instructions, and getting along with others. However, she can sustain the focused attention and concentration necessary to permit the timely and appropriate completion of tasks commonly found in simple routine and repetitive work settings, but cannot do so in detailed or complex, work settings (Exhibit C5E). This supports the claimant has no more than moderate limitations in this area.

As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied.  In this case, the evidence fails to establish the presence of the "paragraph C" criteria. … The claimant has not had repeated episodes of decompensation, she has not had a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause her to decompensate, and she does not have a current history of one or more years inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement.

* * *

**4.    After careful consideration of the entire record, the undersigned finds that this now 25-26 year old claimant with a high school education has the residual functional capacity to perform Light to Medium work as defined in 20 CFR 416.967(c), except that she can sit for a total of 6 hours, without interruption for 1-2 hours, she can stand, and/or walk for a total of six hours in an eight-hour workday, and for 30 minutes to 1 hour without interruption. She can lift and carry frequently 15 pounds and occasionally up to 30 pounds. She has no postural or manipulative limitations. She should not be exposed to the [sic] concentrated or excessive exposure to pulmonary irritants, such as dusts, odors, fumes, humidity, and extremes of temperatures and the like. The claimant is assessed with no more than mild to moderate pain, which does not cause abandonment of task or of the work station, and here mild and moderate are terms specifically defined as not preventing the satisfactory completion of work. However, in an abundance of caution due to her pain complaints (headache history, etc.) and her mental issues, as it may affect her concentration, persistence and pace, and for social concerns, I find that she is limited to semi-skilled and lesser work, to include unskilled, simple, repetitive, and routine work, in jobs with no responsible or regular general contact with the public, and any that occurs must be brief and superficial. She should work in jobs where she can work primarily alone, in jobs that would require little independent judgment, and in jobs that have only routine changes, with no multiple or rapid**

**changes. The claimant is borderline intellectual functioning. See, Exhibit C 10 F, P. 3.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

* * *

In application documents the claimant a twenty-five year old female with a high school education initially alleged her ability to work is limited by cystic fibrosis, chronic asthma, bipolar disorder, and lung disease (Exhibit C2E). She reported her alleged impairments affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, memorize, complete tasks, concentrate, understand, follow instructions, and get along with others. However, she reported she can attend to her personal needs independently. She reported she cares for her children, prepare[s] microwave meals, and cleans her room sometimes. She reported she enjoys watching television and she spends time with others (Exhibit C5E). On appeal, she reported she coughs up blood, has bad chest pains, and it is hard for her to breathe. She reported this change occurred around April 15, 2011 (Exhibit C4E).

At the hearing, when questioned by the undersigned, the claimant testified she was five feet tall and weighs 150 pounds. She testified she had two children and lives with her boyfriend in Birmingham, AL. She testified she has [a] driver's license and a car, and she drives sometimes. She testified since filing her case, she has worked as a cashier. She testified she would stock sometimes, but asked to work as a cashier because it was not hard. She testified she gets food assistance and is able to shop for groceries independently. She testified she is sometimes able to cook, perform housework, vacuum, and do laundry. She testified she does not sweep too much because of dust. She testified she is right handed and cannot carry anything. She testified she does not exercise due to her breathing. She testified most of her day consists of trying to clean up and reading her Bible. She testified she reads a few verses at a time and her favorite part to read is Psalms. She testified she has not had any mental health treatment this year, but has had treatment for headaches and chest pain. She testified she has no inpatient hospitalizations. She testified she cannot work due

to breathing problems, headaches, and asthma. She testified she is no longer on oxygen, but does breathing treatment with a mask. She receives $300 per month in child support and $451 per month in Food Stamps, via a debit card.

When questioned by her representative, she testified her mother was trying to get custody of her daughter and alleged she was an alcoholic. She testified her last pregnancy resulted in a stillborn. She testified she gets help with depression and when she is depressed she cries a lot. She testified she misses her father and when she sees little boys she thinks of her baby. She testified she can be active about thirty minutes before she has to rest.

Dr. Lille McCain, Ph. D, a psychologist medical expert, testified the claimant does not meet the criteria for any mental listing. She testified there were no significant symptoms of depression and no recent treatment; the results of the testing done in November 2014 by Dr. Stutts were noted as an underrepresentation of the claimant's intellectual ability (Exhibit C 24 F, P. 4), and she opined that her adaptive functioning was not compromised. She testified that although the claimant might be moderately impaired in her ability to respond to supervision and carry out detailed instructions, she has no significant limitations with understanding and memorizing. Dr. McCain testified the claimant can perform unskilled to semiskilled work activities.

Dr. William Whatley, M.D, a medical expert[,] testified that although the claimant reported she has cystic fibrosis, when she was examined it was found she did not have cystic fibrosis, but had asthma that was not well-controlled. Exhibit C 7 F, P. 9, 12. Her recent treatment at Children's Hospital was for asthma, not cystic fibrosis. She has been noted as non-compliant with her use of medications for her asthma several times. See, e.g., Exhibit C 3 F, P. 37. Dr. Whatley testified the claimant does not meet or equal a listing. He testified that this 25-year old claimant with asthma could perform medium exertion work activity, with pulmonary irritant limitations.

The medical evidence at Exhibits ClF-C4F, C6F, and ClIF is well before the claimant's alleged onset date of September 25, 2010, but it has been reviewed by the undersigned by way of history. This evidence includes records from Hill Crest Behavioral Health, Children's Health System, Bryan Whitfield Memorial Hospital, Cahaba Center for Mental Health, and Behavioral Health of Selma. The evidence documents a hospitalization in August 2006 for complaints of auditory and visual hallucinations. She was treated

and discharged in stable condition (Exhibit CIF). She was treated at Children's Health System from January 2004 to September 2006 for asthma and cystic fibrosis. It was noted in September 2006 the claimant did not have or meet the diagnostic criteria for cystic fibrosis; her physical examinations indicated her lungs were clear, without any wheezes, rales or rhonchi, and she was diagnosed with asthma, a recent flare possibly related to compliance issues [she had run out of Singulair sometime ago] (Exhibit C 2 F, P. 4). She had emergency room visits at Bryan Whitfield Memorial Hospital from April 2007 to August 2008, with an admission for domestic violence (Exhibit C3F). Exhibit C4F indicates her mental health record was closed in December 2008, with the next entry not falling until in July 2010, indicating she was seeking disability. Her school records reflect the school nurse was aware of the claimant's reported conditions of cystic fibrosis, asthma, and depression and that she was prescribed medication for asthma of symbicort and an albuterol inhaler, but none for depression at that time. (Exhibit C6F, p. 3-4, 5- 6).

The claimant has several emergency room visits from Bryan Whitfield Memorial Hospital. The emergent care notes covering April 2009 through January 2010 reflects the claimant sought emergency care for chief complaints of moderate cough, chest pain, nausea, and vomiting. Her vital signs were essentially within normal limits and a review of systems, including neurological, cardiovascular, and psychological, were otherwise negative. Her chest x-rays were negative for any active disease and her lungs were clear and negative for any infiltrates. She was treated through conservative measures and discharged in stable condition (Exhibit ClIF, 83-145).

From February 2010 to April 2010 she sought treatment for non-disability related complaints in connection with her pregnancy, which included nausea, vomiting, weakness, headaches, vaginal pain and swelling, and abdominal pain. She was ambulatory upon arrival and not in any acute distress. Her 02 Saturation was 100% and her vital signs were within normal limits. She admitted she was not taking any medications. She denied having any respiratory complaints. She was treated conservatively and discharged in stable condition with diagnostic impression of abdominal pain, not otherwise specified (Exhibit C11 F, 18- 82). In May 2010[,] she was hospitalized for a non-disability related complaints of nausea and vomiting in relation to her pregnancy.  Upon examination, her chest was clear bilateral and symmetrical. Her lungs were clear to auscultation and she had regular rate and rhythm. Her vital signs were within normal limits and she was treated conservatively with a

diagnostic impression of hyperemesis gravidarum, with dehydration. She was discharged in stable condition (Exhibit Cl IF, 13-17).

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

In terms of the claimant's borderline intellectual functioning and mood disorder, NOS (provisional), the evidence indicates one month prior to the onset date of September 25, 2010, she attended a psychological evaluation conducted by Richard Reynolds, PhD. ... Based on the examination, Dr. Reynolds diagnostic impressions were major depression, rule out psychotic features. He opined the claimant's reports of seeing her decreased father were not sufficient to establish a diagnosis of psychotic features. He opined the claimant's ability to understand, carry out and remember instructions appeared intact. He lastly opined her ability to respond appropriately to supervision, co-workers, and work pressures in a work setting appeared mildly impaired by major depression (Exhibit C5F, P. 4).

Seven months later on April 6, 2011, she attended a second consultative examination, conducted by Donald Blanton, PhD. Her chief complaints were asthma and cystic fibrosis, but then reported she is depressed sometimes. … She was alert times four and her intellect were estimated to be below average. Her insight was limited and her judgment was considered fair for work. Dr. Blanton's diagnostic impressions were major depression worsened by chronic illness; pulmonary problems, gastrointestinal problems; and a global assessment of functioning (GAF) of 50 (Exhibit C8F).

On May 4, 2011[,] Donald Hinton, PhD., a State Agency medical consultant, completed a Psychiatric Review Technique Form after reviewing the then available evidence and assessing the claimant's mental allegations. Dr. Hinton opined the claimant had mild limitation in restriction of activities of daily living, moderate limitations in difficulties in maintaining social functioning, and moderate limitations in difficulties in maintaining concentration, persistence or pace.  He found no episodes of decompensation, each of extended duration (Exhibit C9F).

Dr. Hinton also completed a Mental Residual Functional Capacity Assessment indicating no more than moderate limitations in any area. Specifically, Dr. Hinton opined the claimant is able to understand, remember, and carry out short and simple instructions. She can attend for two-hour periods. Contact with the general public should not be a usual job duty. Instructions and criticism should be provided in a supportive and non-confrontive manner. Contact with fellow employees should be infrequent and changes in work setting should be minimal (Exhibit CIOF).

In March 2012[,] she presented to Cahaba Mental Health with complaints of recurring depression including crying spells and low energy. She denied suicidal or homicidal ideations and substance abuse. Mental status evaluation noted her mood was dysphoric and her motor activity was calm. Her speech pattern, affect, thought content and thought perception were appropriate and there were no disturbances in her orientation. Her diagnostic impressions were adjustment disorder with depressed mood and a GAF score of 60, indicating moderate limitations (Exhibit Cl8F, P. 7).

In November 2014, the claimant attended a third consultative examination conducted by Lee Stutts, PhD, at which time she was diagnosed with mood disorder, NOS (Provisional) and rule out Major depressive disorder, personality disorder, NOS, and Borderline intellectual functioning. She reported she has cystic fibrosis, asthma, and back pain. She reported a motor vehicle accident in 2012 and injured her back. Her mental status evaluation indicated a well-nourished, well developed female who appeared her stated age. She had adequate eye contact and her verbal output and speech were within normal limits. Her mood and affect were normal and she denied suicidal and homicidal ideation. Her memory and insight were intact; however, her judgment was poor. Dr. Stutts administered the Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV) and the Wide Range Achievement Test-4 (WRAT-4). Her WRAT-4 scores indicated a 73 in Word Reading, a 90 in Spelling, and a 71 in Math Computation. On the WAIS- IV she scored a 68 in Verbal comprehension, a 65 in Perceptual Reasoning, an 83 in Working Memory, a 62 in Processing Speed and a full scale IQ score of 63. Dr. Stutts noted the results lies [sic] in the mild mentally deficient range and at percentile 1. However, Dr. Stutts noted she did not wear her glasses during testing, due to leaving them at home, and he noted she gave only fair effort, and complained of nausea and exhibited a lethargic style during testing. He opined the results are deemed as an underrepresentation of her ability. He also opined she is in the midst of a high risk pregnancy,

appears to focus on short-term gain, and has trouble with simple routine and rules. He further opined she is mildly impaired in her ability to respond appropriately to supervision, coworkers, and the public, but is moderately to severely impaired in her ability to understand, remember, and carry out instructions. He lastly opined treatment would improve all symptoms (Exhibit C24F, P. 4).

Despite the fact the claimant has been diagnosed with the above mental impairments the record reflects no actual treatment for the impairments. In fact, prior records only exhibit routine and/or conservative treatment, and her case was closed in 2008 with Cahaba Mental Health. The evidence indicates four years later she returned to Cahaba Mental Health in March 2012; however in November 2012 the case was again terminated (Exhibit C23F). Although, the available evidence of record indicates, during the relevant period (i.e., AOD to the present), the claimant was diagnosed with the above impairments[.] However, her mental health treatment has been scant and there are no inpatient hospitalizations for any psychiatric problems. When administered the WAIS-IV she obtained a full scale IQ score of 63; however, Dr. Stutts noted she did not wear her glasses during testing due to leaving them at home. He also noted she gave only fair effort, and complained of nausea and exhibited a lethargic style. He opined the results are deemed as an underrepresentation of her ability, and thus were not valid. Although, he opined she is mildly to moderately impaired in her ability to understand, remember, and carry out instructions (Exhibit C 24 F, P. 6), he opined treatment would improve all symptoms (Exhibit C24F). Furthermore, the claimant has worked with the alleged impairments, has lived a fairly independent lifestyle and cares for her children. She testified she has a driver's license and drives, has a high school diploma, and she has worked semiskilled jobs in the past. She testified that she gets food assistance on a debit card and can grocery shop independently using the card. The evidence does not document any follow up mental health visits since March 2012, or any prescribed psychotropic medication, which suggests her symptoms are under control or are no longer symptoms. Moreover, Dr. McCain testified that although the claimant might be moderately impaired in her ability to respond to supervision and carry out instructions, she has no limitations with understanding and memorizing. Based upon her review, Dr. McCain testified the claimant can perform unskilled to semiskilled work activities. The undersigned finds that these only mild to moderate unremarkable findings, as well as the lack of treatment, suggests the claimant is not be [sic] as limited as she alleges from the mental health perspective.

In terms of her asthma, the evidence indicates on January 8, 2011, she sought emergency treatment at Children's Health System with complaints of chest pain and cough. Her physical examination noted her vital signs were essentially within normal limits. She was in no acute respiratory distress and her respirations were normal and non-labored. She had decreased breath sounds on the right without any wheezing noted. She had regular rate and rhythm and her chest x-rays were unremarkable. It was, again, noted that she did not have cystic fibrosis. She was discharged in stable condition and diagnosed with musculoskeletal chest pain, pleurodynia, and viral syndrome, upper respiratory infection (Exhibit C7F, P. 12).

On June 20, 2011, she presented to Bryan Whitfield Memorial Hospital with complaints of a cough for four days. Her physical examination was unremarkable and chest x-rays were negative of any infiltrates. She was discharged in stable condition with a diagnosis of upper respiratory infection (Exhibit CllF, 2-12). She returned on August 23, 2011, with complaints of cough and congestion due to an upper respiratory infection. Her physical examination was unremarkable as well as her chest x-rays. She was discharged in stable condition (Exhibit Cl2F). One month later in September 2011 she returned with sudden chest pains. It was noted she was not in any acute distress and her chest x-rays revealed minimal dextroscoliosis, with no active disease noted (Exhibit Cl3F). She returned in November 2011 with complaints of a sore throat and abdominal pain. Her examination noted her 02 Sat level was 96%. Her vital signs were essentially normal and she was in no acute distress. Her respiration was even and unlabored and she was treated conservatively and discharged in stable condition with a diagnostic impression of upper respiratory infection and pelvic inflammatory disease (Exhibit C I 4F).

On January 11, 2012, she returned to Bryan Whitfield Memorial Hospital with complaints of a headache, cough, sore throat, and hernia problems. Her physical examination was normal, as well as chest x-rays. She was assessed with acute bronchitis and discharged in stable condition (Exhibit Cl6F).

In March 2012[,] she presented to Cooper Green Hospital with complaints of shortness of breath with cystic fibrosis, admitting she had not seen a specialist in years. Her chest x-rays were negative for any abnormalities, and her examination indicated no apparent distress with bilateral breath sounds and no rhonchi, rales, or wheezing noted. She was cleared to return to her normal activities

the next day and discharged with a diagnosis of acute bronchitis (Exhibit Cl9F).

On May 16, 2012, she presented to Vaughan Regional Medical Center with complaints of sore throat and cough. Her examination did not exhibit any distress, including respiratory distress. Her vital signs were within normal limits and her 02 Sat was 97%. She was discharged in stable condition and diagnosed with an upper respiratory infection (Exhibit C20F).

In January 2013, she presented to Hale County Hospital Clinic with complaints of back pains and a headache. Her physical examination was unremarkable and she was assessed with back pain, headache, and an umbilical hernia. She returned in May 2013 with complaints of back pain, shortness of breath, and a headache. Her physical examination was unremarkable for respiratory distress and she was assessed with back pain, umbilical hernia, migraine, strep throat, asthma, and cystic fibrosis, based on her report of medical history (Exhibits C21F and C22F, P. 2, ).

On November 25, 2014, she attended a consultative examination conducted by Huey Kidd, D.O. She reported she was applying for disability due to cystic fibrosis and back problems and has been in and out of the emergency room with shortness of breath. Physical examination indicated she failed to make eye contact and had slurred speech. She did not face the examiner and she did not sit appropriately on the exam table. Dr. Kidd noted she acted in a provocative and inappropriate manner and did not carry on a consistent conversation, had slurred speech. She ambulated without difficulty and had full range of motion throughout. Dr. Kidd had concerns that there was alcohol and drug use involved, but he noted that the claimant and her grandmother denied it; he did not diagnose the claimant with any physical impairment; however, he noted she has bipolar and depression. He opined she is very low functioning and it would be very difficult for her to maintain any sort of employment (Exhibit C25F, 2-6).

Dr. Kidd also completed a Medical Source Statement of Ability To Do Work-Related Activities (Physical). He opined the claimant can occasionally lift and/or carry up to twenty pounds. She can stand, sit, and/or walk four hours at one time and in an eight-hour workday. She can occasionally reach (including overhead), handle, finger, feel, push, and/or pull and use foot controls bilaterally. She can occasionally balance, stoop, kneel, crouch, and crawl, but she can never climb stairs, ramps, ladders, or scaffolds. She can tolerate occasional exposure to humidity, wetness, dust odors,

fumes, pulmonary irritants, extreme cold, extreme heat, and moderate office noise. Dr. Kidd lastly opined she should avoid all exposure to unprotected heights, moving mechanical parts, and operating a motor vehicle (Exhibit C25F, 7-12). However, there are no objective findings to justify limitations on the use of her hands and feet, nor for any postural activities, and so this assessment is rejected.

On December 28, 2014, she presented to the Hale County Hospital for non-disability related complaints in connection with her pregnancy. She was treated and discharged in stable condition (Exhibit C26F).

In March 2015[,] she complained of fatigue, vomiting, and a headache. Her physical examination was unremarkable and she was assessed with acute tonsillitis, acute sinusitis, fatigue, and high risk sexual behavior. She was treated with medication management (Exhibit C27F).

Despite the fact the claimant has emergent treatment for shortness of breath, the evidence indicates she was not in any apparent distress when she arrived at the emergency room hospital and her chest x-rays were negative for any abnormalities (Exhibits CI9F and C20F). Her O2 saturation has been 96 to 100 percent when evaluated at the hospital, with no rhonchi, rales, or wheezing noted. Interestingly, when examined by Dr. Kidd he did not diagnose her with a physical impairment. However, he noted she had regular rate and rhythm and her lungs were clear. She ambulated without difficulty and she had full range of motion throughout (Exhibit C25F). Moreover, Dr. Whatley testified the claimant does not meet or equal a listing, and he opined that she can perform medium work activity, with the only limitations being no exposure to pulmonary irritants. Furthermore, there is no evidence of inpatient hospitalizations since the alleged onset date for any respiratory problems, and treatment records reflect only conservative treatment for her respiratory complaints, which suggests this impairment is under control when the claimant is compliant with her medication regimen. The undersigned finds that the records indicate treatment for mostly mild to moderate to unremarkable findings, and this, along with a lack of treatment, suggests the claimant may not be as limited as she alleges in this respect.

The undersigned finds the claimant's statements regarding her impairments are only partially credible. The evidence in the record indicates the claimant's functional limitations are not as significant

and limiting as has been alleged by the claimant. The evidence of record indicates, despite the claimant's complaints and allegations, she initially admitted she can attend to her personal needs independently. She reported she can prepare microwave meals, clean her room sometimes, shop for groceries, and spend time with others (Exhibit C4E). However, at the hearing she testified she shops for groceries independently, drives, cook[s], and perform[s] housework to include vacuuming and laundry (Testimony). Apparently, the claimant is able to care for her young child at home, which can be quite demanding both physically and emotionally without any particular assistance.  These activities, when viewed in conjunction with the other inconsistencies regarding the claimant's allegations of mental and physical dysfunction, further limit the claimant's credibility in discussing her functional limitations. Of note, her descriptions of daily activities are representative of a fairly active and varied lifestyle and are not indicative of a significant restriction of activities or constriction of interests.

With regards to the claimant's physical limitations, no treating physician has offered an opinion sufficient upon which to assess the claimant's residual functional capacity.  However, the undersigned notes that the above limitations are consistent with and supported by records and reports obtained from the claimant's treating physicians and with the evidence as a whole. Therefore, the undersigned finds that the above residual functional capacity assessment is supported by objective evidence, treatment records, and the record as a whole.

Dr. Whatley testified based on his experience, education and review of the evidence, the claimant's conditions did not meet or equal any listed impairment. The undersigned notes Dr. Whatley's opinion is consistent with records and reports obtained from the claimant's treating physicians and with the evidence as a whole. While it is noted, Dr. Whatley is a non-examining source; he is however, a medical expert for the Social Security Administration. As such, Dr. Whatley possesses an extensive understanding of the disability programs and their evidentiary requirements. In addition, Dr. Whatley had the benefits of reviewing the entire record and being present throughout the claimant's testimony. Therefore, the undersigned gives significant weight to the opinion of Dr. Whatley.

In addition, the undersigned rejects the assessment and Medical Source Statement of Ability to Do Work-Related Activities Physical of Dr. Huey Randolph Kidd (Exhibit C25F). In particular, Dr. Randolph's [sic] opinion is rejected because he opined the claimant is very low functioning and it would be very difficult for her to

maintain any sort of employment. He is out of his field here, not in his field of medicine. He further opined she can only occasionally reach (including overhead), handle, finger, feel, push, and/or pull and use foot controls bilaterally. There is not any physical objective evidence to support such limitations and his clinical exam does not support these limitations either. However, he also opined she can perform activities like shopping, use standard public transportation, prepare simple meals, care for her personal hygiene, and sort, handle, and use paper and/or files. He also opined she can occasionally balance, stoop, kneel, crouch, and crawl, but she can never climb stairs, ramps, ladders, or scaffolds. However, there are no mentions of any musculoskeletal pain that would prevent full time substantial gainful activity. In fact, Dr. Randolph [sic] did not diagnose the claimant with any physical impairment. The undersigned finds Dr. Randolph's [sic] opinion is inconsistent with his own objective findings, which indicated an unremarkable physical examination. Therefore, the opinion expressed is quite conclusory, providing very little explanation of the evidence relied on in forming the opinion and it is therefore rejected.

With regards to the claimant's mental limitations, the undersigned gives significant weight to the opinion and testimony of Dr. McCain, the impartial medical psychologist, who testified the claimant's condition, did not meet or equal a mental listing. While it is noted, Dr. McCain is a non-examining source, she is however a Licensed Clinical Psychologist and a medical expert for the Social Security Administration. Her opinion and testimony is consistent with and supported by the lack of objective evidence on the claimant's part and the record as a whole. In addition, Dr. McCain had the benefits of reviewing the entire record and being present throughout the claimant's testimony. The evidence does not document any mental health treatment since March 2012, which further supports Dr. McCain's opinion. Therefore, the undersigned gives significant weight to the opinion of Dr. McCain.

The undersigned gives significant weight to the opinion of Dr. Lee Stutts, the consultative examiner (Exhibit C24F). Dr. Stutts diagnosed the clamant with mood disorder, NOS (Provisional). It is noted that Dr. Stutts administered the Wechsler Adult Intelligence Scale- Fourth Edition (WAIS-IV) but he opined the results are deemed as an underrepresentation of her ability. He noted she did not wear her glasses during testing due to leaving them at home, and she gave only fair effort, but complained of nausea and exhibited a lethargic test taking style. Although, he opined she is mildly to moderately impaired in her ability to understand, remember, and carry out instructions, he opined that treatment

would improve all symptoms. The undersigned finds Dr. Stutts['s] examination and assessment is consistent with and supported by records and reports obtained from the claimant's treating physicians and with the evidence as a whole. Therefore, the undersigned gives Dr. Stutts'[s] opinion significant weight.

In addition, the undersigned gives substantial weight to the opinion of Dr. Donald Hinton, the State agency medical consultant (Exhibits C9F and Cl0F). In particular, Dr. Hinton's opinions are consistent with the lack of significant mental health treatment in the record; the unremarkable examinations; the vague responses at the consultative examination; no psychotropic medications; and the claimant's extensive activities of daily living. Although, Dr. Hinton did not examine the claimant; however, he provided specific reasons for his opinion indicating his opinion was grounded in the evidence of record. The undersigned finds the evidence received into the record after the initial determination did not provide any new or material information that would significantly alter findings about the claimant's functional limitations. Therefore, Dr. Hinton's opinions are accorded substantial weight.

In summary, based on the totality of the evidence as comprehensively discussed above, the undersigned finds the claimant only partially credible regarding her self report of the nature and extent of her functional limitations. The undersigned also finds considerable medical evidence to conclude that the claimant's impairments do not prevent the performance of substantial gainful activity within the assessed residual functional capacity. Total disability from all work activity is not established in this case.

\* \* \*

**10. The claimant has not been under a disability, as defined in the Social Security Act, since February 1, 2011, the date the application was filed (20 CFR 416.920(g)) through the date of this decision.**

(Tr. at 633-47).

## IV.  DISCUSSION

A claimant is entitled to an award of SSI benefits if the claimant is unable

to engage in substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or last for a continuous period of not less than 12 months. *See* 20 C.F.R. § 416.905(a). The impairment must be severe, making the claimant unable to do the claimant's previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-11. "Substantial gainful activity means work that … [i]nvolves doing significant and productive physical or mental duties [that] [i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510.

In all Social Security cases, an ALJ utilizes a five-step sequential evaluation in determining whether the claimant is disabled:

> (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the severe impairment meets or equals an impairment in the Listing of Impairment in the regulations; (4) if not, whether the claimant has the RFC to perform her past relevant work; and (5) if not, whether, in light of the claimant's RFC, age, education and work experience, there are other jobs the claimant can perform.

*Watkins v. Comm'r of Soc. Sec.,* 457 F. App'x 868, 870 (11th Cir. 2012) (per curiam) (citing 20 C.F.R. §§ 404.1520(a)(4), (c)-(f), 416.920(a)(4), (c)(f); *Phillips v. Barnhart,* 357 F.3d 1232, 1237 (11th Cir. 2004)) (footnote omitted). The claimant bears the burden of proving the first four steps, and if the claimant does so, the burden shifts to the Commissioner to prove the fifth step. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).

If the claimant appeals an unfavorable ALJ decision, the reviewing court must determine whether the Commissioner's decision to deny benefits was "supported by substantial evidence and based on proper legal standards."

*Winschel v. Comm'r of Soc. Sec.,* 631 F.3d 1176, 1178 (11th Cir. 2011) (citations omitted); *see* 42 U.S.C. § 405(g). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* (citations omitted). "In determining whether substantial evidence exists, [the reviewing court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The reviewing court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]." *Id*. When a decision is supported by substantial evidence, the reviewing court must affirm "[e]ven if [the court] find[s] that the evidence preponderates against the Secretary's decision." *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).

As set forth above, Teacher has asserted three reasons why she argues the Commissioner's decision to deny her benefits is in error. The Court will address each issue in turn.

## A.  Headache Disorder

Teacher asserts that the ALJ's determination that her headache disorder is a non-severe disorder was in error because it is not supported by substantial evidence. She argues that the ALJ picked very few records to support his position and ignored other records that showed that she had been diagnosed with migraines on multiple occasions. (Tr. 653-672). The medical records cited by Teacher to support the argument that she had been diagnosed with migraines

on multiple occasions are medical records from the Hale County Hospital Clinic dating from January 31, 2013 until August 15, 2013.

When Teacher went to the clinic on January 31, 2013, she complained, inter alia, of headaches and back pain. The record reflects that she said, "I've been having really bad back pains and headaches: I was in a really bad accident in December: sometimes my eyes get blurry." (Tr. 656). She reported a history of migraines, but the Court notes that none of her preceding voluminous records support this history. She was discharged with a prescription for Maxalt and told to follow-up in 2 months. On May 2, 2013, Teacher went again to the clinic complaining of back pain, headache, and shortness of breath. (Tr. 666). The history from that visit noted that she reported severe interference with activities of daily living and household activities, but the history does not reflect which of her complaints was causing this interference. With regard to headache, a review of her systems revealed occasional headaches with sharp and throbbing pain in the facial/sinus area and a ringing noise. She was arranged a consult with Dr. Wallace on May 30 for her headaches, but there are no records reflecting that visit. She was also prescribed Maxalt on this visit. Teacher next went to the clinic on July 16, 2013 and did not complain of headaches. (Tr. 664). Teacher went to the clinic on August 15, 2013, complaining of back pain and needing a shot of depo prevara. She did not complain of headaches on that visit either. (Tr. 662-63).

Teacher argues that, even if the headaches were related to sinusitis, as found by the ALJ, the number of visits to the Emergency Room (ER) with

complaints of headaches is significant in evaluating their effect on her ability to work. The transcript reflects that, prior to the visits referenced above, Teacher had seven visits to clinics/ERs from October 28, 2005 to January 19, 2012 where she complained of headaches, along with other symptoms. At each of these visits, she was diagnosed with illnesses that have headache as a symptom; i.e., sinusitis, bronchitis, and upper respiratory infection. She was not diagnosed with migraines at any of these visits.

A "severe" impairment is one that significantly limits the ability to perform basic work activities. *See* 20 C.F.R. § 416.921. The ALJ's determination that Teacher's sporadic reports of headaches do not constitute a severe impairment is supported by substantial evidence. In addition to the foregoing evidence, which shows the sporadic nature of the headaches and the fact that her headaches were symptoms of other illnesses or an accident, rather than a separate disease process, Dr. Whatley, one of the medical experts testified that the medical records did not establish headaches so extreme as to warrant medical evaluation or referral to a specialist. (Tr. 23 ("they didn't think it was very significant")).

Teacher did not produce evidence of disabling headaches that caused limitations above those considered by the ALJ in his residual functional capacity assessment. 42 U.S.C. § 423(d)(5)(A); *see Ellison v. Barnhart,* 355 F.3d 1272, 1276 (11th Cir. 2003) (finding that claimant bears the burden of proving disability and is responsible for producing evidence in support of his claim). Teacher's complaints of headache pain were a subjective symptom, and the ALJ properly assessed the severity of Teacher's subjective symptoms. 20 C.F.R. § § 416.928,

416.929. In his decision, the ALJ stated: "However, in an abundance of caution due to her pain complaints (headache history, etc.) and her mental issues, as it may affect her concentration, persistence and pace, and for social concerns, I find that she is limited to semi-skilled and lesser work, to include unskilled, simple, repetitive, and routine work, in jobs with no responsible or regular general contact with the public, and any that occurs must be brief and superficial." (Tr. 636).

Based on the foregoing, the Court finds that the ALJ's decision in regard to Teacher's complaints of headaches was supported by substantial evidence and was not in error.

## B.  Mental Incapacity

Teacher argues that, in considering her mental limitations, the ALJ failed to address or consider a medical report from August 2, 2006, in which Dr. Jon Williamson diagnosed Teacher as being mildly mentally retarded upon her discharge from Hill Crest Hospital (Tr. 228) or Teacher's statements in a disability report that she has trouble with math, has never paid her own bills, does not know how to fill out a money order, has trouble reading and writing, and that it is hard for her to understand some things. (Tr. 205, 207). Teacher contends that the record as a whole shows that her mental limitations are more severe than accepted by the ALJ, and the ALJ's failure to include Teacher's mental incapacity in his assessment is not supported by substantial evidence.

Teacher did not list mental retardation as one of her impairments on her application or in any other paperwork during the administrative process. Teacher

has the burden to present evidence of her impairments and their severity. *See, e.g., East v. Barnhart*, 197 F. App'x 899, 902 (11th Cir. 2006); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). "Although the ALJ must consider all the impairments the claimant alleges in determining whether the claimant is disabled, … **the ALJ need not scour the medical record searching for other impairments** that might be disabling, either individually or in combination, **that have not been identified by the claimant**." *East*, 197 F. App'x at 902 (emphasis added). "In order to *meet* a listing, the claimant must (1) have a diagnosed condition that is included in the listings and (2) provide objective medical reports documenting that this condition meets the specific criteria of the applicable listing and the duration requirement. A diagnosis alone is insufficient." *Wilkinson ex rel. Wilkinson v. Bowen*, 847 F.2d 660, 662 (11th Cir. 1987) (citing 20 C.F.R. § 416.925(c)-(d)). In this case, the only mention of mental retardation was in a discharge summary dated August 8, 2006 that was completed by Dr. Jon Williamson in which he accorded Teacher a final diagnosis of "mild mental retardation," among others. (Tr. 228). There was no objective evidence in his records to support this diagnosis. Moreover, he also treated Teacher during a hospitalization from February 15, 2006 to February 23, 2006. (Tr. 235). In that discharge summary, there was no diagnosis of mental retardation and, in fact, in the summary of her mental status in the discharge summary, Dr. Williamson stated that she had "estimated intelligence average." (Tr. 236). Teacher's reliance on a single discharge diagnosis from a 2006 hospitalization that occurred almost 5 years before the relevant period is not enough to defeat the

substantial evidence upon which the ALJ relied in concluding that she had borderline intellectual functioning, which he found to be a severe impairment. The record contains no evidence during the relevant period that supports a finding of mental retardation, despite multiple evaluations and IQ testing.

In making his finding of borderline intellectual functioning that did not meet or equal a listing, the ALJ considered the opinion of Dr. Stutts, an examining psychologist, who diagnosed possible borderline intellectual functioning and delineated mental functional limitations, the opinion of Dr. McCain, a psychological expert, who opined that Teacher could perform the same semiskilled or unskilled labor that she had previously performed, and the opinion of Dr. Hinton, the State agency medical examiner, that she had moderate limitations in maintaining social functioning and moderate limitations in maintaining concentration, persistence, or pace. (Tr. 637, 639-41, 644-45). The ALJ explained that he discredited Dr. Kidd's opinion that Teacher is mentally low functioning because he is a family practitioner who was contracted to perform a "disability physical," and therefore, making a mental assessment was outside his field of expertise. The Court notes that Dr. Kidd did not perform any assessments of her intellectual abilities. (Tr. 642). In addition, Dr. Kidd's records reflect that he had concerns that she had been drinking or taking drugs at the time of her visit to him. (*Id*.).

This Court finds the Eleventh Circuit's opinion in *East v. Barnhart*, 197 F. App'x 899 (11th Cir. 2006), instructive here. In *East*, the plaintiff claimed she was disabled due to her physical impairments of back injuries, asthma and seizures

and her mental impairments of bipolar disorder, depression, suicide attempts, and a learning disability. The ALJ concluded she was not disabled, and the plaintiff appealed arguing that the ALJ failed to consider her borderline personality disorder diagnosis. *Id*. at 901. The Eleventh Circuit stated:

> East did not list borderline personality disorder as one of her impairments on her application or in any other paperwork she completed during the administrative process. Furthermore, the record contains no evidence of the effect that East's borderline personality disorder had on her ability to perform basic work activities. She did not describe the effect borderline personality disorder had on her abilities in either her daily living questionnaire or her hearing testimony. None of her doctors completed any paperwork evaluating how East's borderline personality disorder limited her abilities. Indeed, a description of the symptoms of this mental disorder cannot even be found in the record. Instead, East's medical records contain brief references to either historical or "by report" borderline personality disorder diagnoses, most of which occurred prior to East's alleged onset date. In fact, it does not appear from the record that any of East's treating physicians, after her alleged onset date, independently diagnosed East with borderline personality disorder. Instead, since East's alleged onset date, her primary diagnoses of mental impairments have been depression and bipolar disorder.
>
> East has the burden to present evidence of her impairments and their severity. *See Jones v. Apfel,* 190 F.3d 1224, 1228 (11th Cir.1999). Although the ALJ must consider all the impairments the claimant alleges in determining whether the claimant is disabled, *see Jones v. Dep't of Health & Human Servs.,* 941 F.2d 1529, 1533 (11th Cir.1991), the ALJ need not scour the medical record searching for other impairments that might be disabling, either individually or in combination, that have not been identified by the claimant. Under the circumstances, we cannot say the district court committed reversible error in failing to consider East's borderline personality disorder.

*Id.* at 902.

Based on the foregoing, Teacher's claim that the ALJ erred by failing to consider mental retardation as one of her disabilities is without merit. Substantial

evidence supported the ALJ's determination that Teacher has borderline

intellectual functioning that does not meet or equal a listing.

## C. <u>Mental Residual Functional Capacity Assessment</u>

Finally, Teacher argues that the ALJ's mental residual functional capacity

("RFC") assessment is not supported by the record as a whole because he erred

in his evaluation of Dr. Stutts's opinion regarding her mental functional

limitations. (Doc. 28 at pp. 5-6). Regarding her mental impairments, the

hypothetical that the ALJ presented to the vocational expert stated:

> However, in an abundance of caution due to her pain complaints
> (headache history, etc.) and her mental issues, as it may affect her
> concentration, persistence and pace, and for social concerns, I find that
> she is limited to semi-skilled and lesser work, to include unskilled, simple,
> repetitive, and routine work, in jobs with no responsible or regular general
> contact with the public, and any that occurs must be brief and superficial.
> She should work in jobs where she can work primarily alone, in jobs that
> would require little independent judgment, and in jobs that have only
> routine changes, with no multiple or rapid changes. The claimant is
> borderline intellectual functioning. See, Exhibit C 10 F, P. 3.

(Tr. 636).

Teacher asserts that this hypothetical was not supported by the evidence

because the ALJ incorrectly stated Dr. Stutts's opinion regarding her limitations.

The ALJ stated in his decision that Dr. Stutts opined that Teacher is "mildly to

moderately impaired in her ability to understand, remember and carryout

instructions, [and] he opined that treatment would improve all symptoms." (Tr.

644). However, according to Teacher, Dr. Stutt's opinion also specifically states

that "[e]valuation of Ms. Teacher reveals … her ability to understand, remember

and carry out instructions is moderately to severely  impaired." (Tr. 680).

Teacher argues that the hypothetical given above based on the the ALJ's mental

RFC assessment did not line up with Dr. Stutts's opinion of moderate to severe impairment regarding the ability to remember, understand and carry out instructions because it included semi-skilled work as part of the assessment. Relying on *Maiben v. Astrue*, Civ. A. No. 07-0287-M, 2008 WL 1697257, at * 2-3 (S.D. Ala. 2008), Teacher asserts that because it is unclear if the ALJ gave proper weight to Dr. Stutts's opinion in his RFC assessment and whether he gave the proper assessment in his hypotheticals provided to the vocational expert, the case is due to be reversed because it is not supported by substantial evidence.

Stutts was retained by the Social Security Administration to perform a psychological evaluation of Teacher, which was performed on November 18, 2014, when Teacher was five months pregnant in a high-risk pregnancy. (Tr. 677). Stutts administered the Wechsler Adult Intelligence Scale and WRAT-4 to Teacher, on which she scored a full-scale IQ score of 63, which lies in the mild mentally deficient range. (Tr. 679). Stutts noted that Teacher did not wear her glasses during the testing (left them at home), gave fair effort, complained of nausea, exhibited lethargic style, and was in the midst of a high risk pregnancy, and therefore, opined that the results were an underrepresentation of her ability. (Tr. 679). Stutts had limited medical and mental health records to review for the evaluation (only from 2012). (Tr. 679). Stutts stated that "[e]valuation of Ms. Teacher reveals her ability to respond appropriately to supervision, co-workers and the public to be mildly impaired and her ability to understand, remember and carry out instructions is moderately to severely impaired. All would improve with treatment." (Tr. 680). Stutts also completed a "Medical Source Statement of Ability to

Do Work-Related Activities (Mental)" form on November 18, 2014. This form defines the rating terms: none, mild, moderate, marked, and extreme. (Tr. 681). On this form, Stutts indicated that Teacher's ability to understand, remember, and carry out instructions is affected by her mental impairment. (Tr. 681). Specifically, he indicated that Teacher's ability to understand and remember simple instructions, her ability to carry out simple instructions, and her ability to make judgments on simple work-related decisions are mildly impaired, and her ability to understand and remember complex instructions, ability to carry out complex instructions, and her ability to make judgments on complex work-related decisions are moderately impaired. (Tr. 681). The form defines mild as "[t]here is a slight limitation in this area, but the individual can generally function well," and the form defines moderate as "[t]here is more than a slight limitation in this area but the individual is still able to function satisfactorily." (Tr. 681).

A review of the entire record reveals that the ALJ was presented with multiple opinions regarding Teacher's mental functional limitations. After reviewing those opinions, he gave significant weight to the opinions of consultative psychologist Dr. Stutts and medical expert Dr. McCain, substantial weight to the opinion of State agency psychologist Dr. Hinton, and rejected the opinion of examining family practice physician Dr. Kidd. (Tr. 644). The ALJ summarized Dr. Stutt's opinion as "mildly to moderately impaired in her ability to understand, remember and carry out instructions." (Tr. 644). This opinion was supported by the detailed questionnaire completed by Dr. Stutts, in which "mild" and "moderate" have distinct definitions. (Tr. 681). This opinion of Dr. Stutt's was also supported by Dr. McCain's testimony that the record did not support a moderate impairment in carrying out detailed instructions and that there were no

significant limitations in understanding and memory. (Tr. 19-20). This finding was also consistent with Dr. Hinton's opinion that she had moderate limitations in maintaining social functioning and moderate limitations in maintaining concentration, persistence, or pace. (Tr. 639-40).

"At step five of the evaluation process, the burden shifts to the Commissioner to prove that other jobs exist in the national economy that the claimant can perform." *Carter v. Comm'r of Soc. Sec.*, 411 F. App'x 295, 298 (11th Cir. 2011). The ALJ can determine whether such jobs exist by asking a vocational expert a hypothetical question to establish whether someone with the claimant's impairments can perform a job in the national economy. *See id.* "In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Id.* (citing *Vega v. Comm'r of Soc. Sec.*, 265 F.3d 1214, 1220 (11th Cir. 2001). "However, the ALJ is not required to include findings in the hypothetical that the ALJ has found to be unsupported." *Id.* Although Dr. Stutts's narrative statement stated that Teacher's ability to understand, remember and carry out instructions was moderately to severely impaired, it is significant that the term "severely" that Stutts used in the narrative statement is undefined, while the terms "mild" and "moderate" are defined in the questionnaire, especially in light of the findings of Dr. McCain and Dr. Hinton and in light of the fact that Dr. Stutts opined those impairments would improve with treatment. It is certainly reasonable to conclude that the ALJ did not find that the isolated and undefined statement was supported in such a way that it should be included in the

hypothetical in light of the more detailed and objective opinions expressed in the questionnaire completed by Dr.Stutts. The consistent opinions of Dr. McCain and Dr. Hinton, along with other evidence in the record, constitutes substantial evidence supporting the ALJ's RFC assessment and hypothetical, as well as his final decision.

Even if the ALJ erred in his hypothetical by including semi-skilled work, the error was harmless because the vocational expert only included unskilled work in his evaluation, and the ALJ's opinion that significant jobs exist in the national economy which Teacher can perform taking into consideration her age, education, work experience, and residual functional capacity relied upon that assessment. (Tr. 646). *See Carter*, 411 F. App'x at 298 (finding that ALJ not referencing claimant's adjustment disorder in his hypothetical to vocational expert was harmless error because the ALJ's determination that these problems did not affect claimant's ability to work was supported by evidence in the record).

## CONCLUSION

In light of the foregoing, it is **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff benefits be **AFFIRMED**.

**DONE** and **ORDERED** this the **21st** day of **June, 2017**.

s/P. BRADLEY MURRAY
**UNITED STATES MAGISTRATE JUDGE**